[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1428-WWW
Plaintiff is a law firm with an office in Fairfield. Robert Maniscalco, a member of the firm, had previously done commercial work for the defendants who were real estate developers. Defendants admit that they retained plaintiff to represent them in a transaction which contemplated the purchase and development of property in Milford, Connecticut known as Milford Rivet. No fee arrangement was discussed and plaintiff commenced work on their approximately five million dollar transaction on or about November 29, 1989. The representation continued through early December, 1990. The transaction failed because defendants were unable to obtain the necessary financing. Their contract with the seller contained a financing contingency clause which allowed defendants to terminate the contract and retrieve their $50,000 deposit from the designated escrow agent (First American) if financing failed. Plaintiff's claim for fees and the law firm's actions taken with respect to the funds in escrow precipitated this lawsuit.
The complaint alleges in the first count that plaintiff rendered legal services to the defendants at defendants' request; therefore, plaintiff is entitled to the reasonable value of those services. The second count alleges unjust enrichment.
Defendants pleaded two special defenses: (1) the claimed fee is unreasonable and (2) any fee was forfeited by plaintiff's unethical conduct in delaying the release of the deposit.
In addition, defendants filed a counterclaim alleging:
1. violations of Connecticut's Unfair Trade Practices Act (CUTPA);
2. breach of fiduciary duty by plaintiff attorneys; and,
3. interference with the defendants' contract right to the return of the funds held in escrow.
PLAINTIFF'S CLAIMS
Defendants admit retaining plaintiff and agreeing to pay for legal services rendered. The question is what is the reasonable value of the services rendered. CT Page 1428-XXX
Defendants advised plaintiff in mid-November, 1990 that they would probably not obtain the necessary financing by December 1, 1990 when the financing contingency clause would expire. Under date of November 16, 1990, plaintiff sent defendants a bill in the amount of $18,000 for legal fees and $492 for disbursements (total $18,492). This bill did not itemize all the dates of service or detail the time spent on each of the matters itemized in the bill.
When financing did not materialize, the defendants became entitled to a return of their $50,000 deposit on November 30, 1990. The plaintiff requested that the escrow agent return the money to plaintiff as trustee for defendants.
Before the plaintiff requested the return of the escrow, a dispute had arisen regarding the amount of plaintiff's bill of November 16, 1990. Defendant Brooks, on learning of the escrow request by plaintiff, demanded that the money be returned to him. Plaintiff advised the escrow agent not to release any money to defendant Brooks. On December 19, 1990, the escrow agent released $32,000 to defendant Brooks and the remaining $18,000 was released to Brooks on March 8, 1991.
The bill sent to the defendants was in the amount of $18,492. The plaintiff alleged in the second count of the complaint that the services were worth $20,067 and Attorney Maniscalco testified to a value of $27,000. The plaintiff argued that the $18,492 bill was discounted in the expectation of payment and in consideration of the fact that the transaction never closed, therefore, they should not be bound by the amount claimed in the bill.
The general rule on the question of what is a reasonable fee is set out in Ballard v. Estate of Ballard, 13 Conn. Sup. 400,407 (1945):
 `"In the absence of an express contract of employment between an attorney and his client fixing the amount of the attorney's compensation, it is generally held that the attorney is entitled to what his services are reasonably worth, or what has usually been paid to others for similar services. The determination of this depends largely upon the circumstances of the particular case. Among other things to be considered are the CT Page 1428-YYY importance and results of the case, the difficulties thereof, the degree of professional skill and ability required and exercised, the skill, experience, and professional standing of the attorney, and the prominence or character of the parties, where it affects the importance of the litigation, as well as the amount or values involved or recovered." 5 Am.Jur., Attorneys at Law § 198, pp. 379, 380.'
The result or outcome of the matter is also a factor which may be considered. First National Bank Trust Co. v. Blakeslee,5 Conn. Sup. 12 (1937). The court noted at page 15:
 "If his [attorney's] efforts are marked by success, that is a factor of no mean significance which legally and ethically permits him to place a higher value on his services than if the outcome had been unsatisfactory."
The court enhanced the attorney's fee beyond the amount stated in the then deceased attorney's ledger because of the successful result. In the instant case, the court can and does consider the fact that the contemplated transaction failed.
The plaintiff did not keep contemporaneous time records and constructed a detailed, time itemized bill only after the fee dispute arose. The plaintiff relied on telephone bills, letters, drafts of contracts, penciled notes and documents in the file to arrive at a total of 159 hours. The accuracy of this time figure was severely and successfully tested by cross-examination. Plaintiff billed a minimum of 15 minutes for any telephone call even though telephone bills showed many of them to be no more than one or two minutes, for example, approximately 37.5 hours of telephone calls unconnected to any other activity are listed on the plaintiff's itemized bill. Maniscalco also conceded on cross-examination that most of the 8.5 hours billed in December, 1990 were related to the escrow dispute not service to the defendants. The defendants' reliance on Tedesco v. Stamford,24 Conn. App. 377 (1991) is misplaced. The appellate court deferred to authority from the second circuit that attorney's fees in section 1983 civil rights actions must be validated by contemporaneous time records to be allowed. The instant case is CT Page 1428-ZZZ not governed by federal law.
Upon consideration of all of the evidence, the factors stated in Ballard, supra, and the failure of the transaction, the court finds that the reasonable value of the services were $13,000 plus disbursements of $492.
Defendant claims that plaintiff's unethical actions with respect to the escrow account and his discharge for same justify a complete forfeiture of the fee as a sanction. Defendants citeEsser v. A. H. Robins Co., Inc., 537 F. Sup. 197, 200 (D.Minn. 1982); Culebras Enterprises Corp. v. Rivera Rios, 846 F.2d 94, 97
(1st Cir. 1988); Rybicki v. State Board of Elections, 584 F. Sup. 849,860-61 (N.D. Ill. 1984); Petition of Rosenman, Colin Freund,Lewis Cohen, 600 F. Sup. 527, 533 (S.D.N.Y. 1984) and Gonzalezv. Hegner, 20 Misc.2d 232, 192 N.Y.S.2d 212 (Sup.Ct. N.Y. Co. 1959).
In the instant case, the actions claimed as misconduct were not part and parcel of the representation, but occurred after the services had been completely rendered. This is a major distinguishing factor from the authority cited by the defendants. The court declines to exercise its discretion to order the fee forfeited because the services were fully rendered prior to the claimed misconduct.
DEFENDANTS' COUNTERCLAIM
Each of the three counterclaims alleges that, in various ways, the plaintiff acted improperly with respect to the $50,000 that First American held in escrow.
A. CUTPA
Defendants claim that the following alleged conduct violated Connecticut General Statutes § 42-110b[1] et seq., Connecticut Unfair Trade Practices Act (CUTPA):
1. failure to provide an explanation of or support for the legal services billed;
2. threatening baseless legal action against the escrow agent if the deposit were to be returned to the defendant Brooks;
3. improperly claiming an attorney's lien on the security CT Page 1428-AAAA deposit;
4. instructing the escrow agent to disregard defendant Brooks' instructions; and,
5. instructing the escrow agent to retain the entire $50,000 deposit even though the total amount claimed was approximately $18,500.
In Conaway v. Prestia, 191 Conn. 484, 492-93 (1983), the court quoted from FTC v. Sperry Hutchinson Co., 406 U.S. 233, 244n (1972) with respect to factors to be considered in determining whether a practice was unfair. Those factors are:
 "`(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
 (2) whether it is immoral, unethical, oppressive, or unscrupulous;
 (3) whether it causes substantial injury to consumers. . . .'"
Each of the alleged acts must be examined in light of the evidence and the criteria set out above. It is not necessary that all of the criteria be satisfied. A practice may meet one or more of the criteria, or to some lesser extent all three and be an unfair practice. Atlantic Richfield Co. v. Canaan Oil Co.,202 Conn. 234, 242 (1987).
The court finds that the plaintiff submitted a three page bill, under date of November 16, 1990, itemizing services rendered through the date of the bill. After the defendant Brooks complained in writing about the amount of the bill, Robert Maniscalco, a member of the plaintiff law firm, responded to Brooks by letter and indicated that he would respond to questions about the bill. Although the communication between the parties became increasingly more bitter from the time of the November billing until the defendants terminated the plaintiff's services CT Page 1428-BBBB as of December 11, 1990, the court finds no refusal to give information that would constitute a CUTPA violation.
The defendant's second, third and fourth CUTPA claims will be discussed together. They are interrelated as they turn on whether the plaintiff's claim of a special or charging lien against the escrow deposit violates CUTPA. It is not necessary for this court to decide whether such a lien applies to the deposit on a real estate transaction that is to be returned to the buyer upon the failure of the mortgage financing contingency. Rather, the question is whether the plaintiff's assertion of such a lien was so baseless and lacking in merit as to constitute a violation of CUTPA. The court finds no such violation.
First American returned $32,000 of the deposit to Brooks on December 19, 1990. This was within 15 days of Brooks' request to First American. Neither party introduced the actual escrow agreement into evidence, but a First American representative testified that it was customary to deal with the attorneys for the parties and not the parties themselves.
The court finds that this testimony was credible. The plaintiff had a signed authorization from the seller's attorney authorizing First American to release the deposit to the plaintiff. The court finds that the plaintiff was acting properly in requesting a return of the deposit to the plaintiff as trustee.
In Perlmutter v. Johnson, 6 Conn. App. 292, 298, 505 A.2d 13
(1986), the court stated that "It has long been held that an attorney has an `equitable lien upon the avails [of his actions for a client] for the services and expenses in the suit.'" The attorney in Perlmutter retained the client's funds that represented a reimbursement of costs from the Branford Board of Zoning Appeals in a prior matter. The court ruled that the attorney had a lien on those funds for his fee. While the funds at issue here did not result from a lawsuit, the funds were a reimbursement of the deposit put up by the defendant Brooks similar to the reimbursement of costs in Perlmutter. A reimbursement is the return of money previously laid out by the client.
First American's representative had not previously dealt with a claimed attorney's lien and First American took a reasonable time to inform itself as to what would be a proper course of action. Under the circumstances here, the court cannot find that CT Page 1428-CCCC the assertion of a lien was so baseless and lacking in merit as to constitute a CUTPA violation.
The last CUTPA claim is that the plaintiff attempted to hold up the release of the entire $50,000 when the plaintiff's claim was only $18,000. The plaintiff did ask First American to retain the funds while the parties tried to resolve the dispute. Because each party had requested the entire $50,000, this request to "freeze" the situation temporarily was not a CUTPA violation. Had the escrow agent released the $50,000, it would have vitiated the lien, if any, that the plaintiff had. Within a reasonable time, First American released $32,000 to Brooks and advised the parties that it would file an interpleader as to the balance unless the parties worked out an agreement.
B. BREACH OF FIDUCIARY DUTY
In this second counterclaim, the defendants reiterate the CUTPA claims and add a claim that the plaintiff used confidential information obtained during the representation of the defendants for the law firm's own purposes. The defendants' claim that Maniscalco knew of the defendant Brooks' dire financial straits and used that information to formulate a strategy to prevent the return of the deposit to Brooks.
The court finds that this allegation has not been proven. Brooks testified that he discussed bankruptcy with Maniscalco, who did not remember such conversations. Nothing in the evidence establishes that bankruptcy discussions or that any other confidential information was used in any way to the plaintiff's advantage.
C. TORTIOUS INTERFERENCE WITH CONTRACT
In their last counterclaim, the defendants reiterate the CUTPA allegation that the plaintiff improperly instructed First American to disregard the defendants' instructions. They add two additional allegations:
1. First American refused to release the remaining $18,000 of the $50,000 escrow deposit because of the plaintiff's interference with the escrow agreement; and,
2. First American breached the escrow contract by failing to abide by defendants' instructions and such failure resulted CT Page 1428-DDDD from the plaintiff's tortious interference with the escrow contract.
This claim is unavailing. First American did not breach the contract; it undertook a reasonable investigation as to its responsibilities that caused a 15 day delay in the disbursement of $32,000 of the deposit. The balance, $18,000, was released on March 6, 1991 pursuant to an agreement of the parties. The agreement resulted in the creation of an $18,500 bond that is being held by the defendants' attorney to satisfy any judgment that the plaintiff may obtain in this matter. The improper instruction claim was resolved in the discussion of the CUTPA claims.
The court finds in favor of the plaintiff on the complaint and the counterclaim. Accordingly, judgment enters for the plaintiff in the amount of $13,492 plus costs.
E. EUGENE SPEAR, JUDGE